## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ECONOMIC RESEARCH SERVICES, INC.,<br><br>                              Plaintiff,<br><br>vs.<br><br>RESOLUTION ECONOMICS, LLC, PAUL WHITE, and ALI SAAD,<br><br>                              Defendants. | Civil Action No.:<br><br><br>**VERIFIED COMPLAINT AND**<br>**JURY DEMAND** |

Plaintiff Economic Research Services, Inc. ("ERS"), by and through its counsel, LeClairRyan, and McElroy, Deutsch, Mulvaney & Carpenter, LLP, alleges by way of Verified Complaint against defendants Paul White ("White"), Ali Saad ("Saad"), and Resolution Economics, LLC ("Resolution") (collectively, "Defendants"):

### NATURE OF THE ACTION

1.     This is a classic case of corporate raiding and unfair competition.  Defendants conspired to, and have succeeded in, unlawfully misappropriating plaintiff ERS's invaluable and confidential business information and luring away ERS's Washington, D.C. labor and employment group (the "L&E Group")  and clients in order to set up an identical business to ERS, two blocks down the road from the remnants of ERS's Washington, D.C. office.

2.     Defendants' actions have left ERS's Washington, D.C. office a shell of its former self.  Defendants have not simply expanded their own business, but have succeeded in siphoning away L&E Group's business identity, technical expertise, employees and clients.  In a word, the effect of Defendants' actions has been devastating.

3.     Defendant White is a former managing director of ERS.  As part of his responsibilities, White interfaced directly with ERS's clients and supervised the L&E Group. The L&E Group consisted of nine employees, who provided economic research and statistical

analysis in the labor and employment field for clients needing internal analyses or litigation support.   White also personally provided expert services to ERS's clients in labor and employment related engagements.

4.      Looking to enter into the Washington, D.C. marketplace, defendant Saad, an owner and managing director of defendant, Resolution, conspired with White to raid ERS's Washington, D.C. office, misappropriate ERS's confidential, non-public business information, and lure away ERS's Washington, D.C. employees and clients.

5.      White resigned from ERS to open Resolution's Washington D.C. office, effective July 17, 2015.

6.      Before doing so, with his foot already out the door, White signed a new compensation agreement with ERS days before he resigned.   White did not disclose his intentions to leave ERS and take its L&E Group and clients with him when he signed the agreement.  Had ERS known Defendants' plans, it would not have entered into the agreement.

7.      In furtherance of the scheme and at White's insistence, the new compensation agreement watered down White's non-solicitation obligations.  In light of White's material non-disclosure and tortious conduct, the new compensation agreement is ineffectual and void. Nevertheless, White did not even abide by the terms of the new agreement.

8.      Mere hours following White's departure from ERS, Resolution contacted ERS's clients to announce that White had joined Resolution and with the clear intent to solicit business from ERS's clients.

9.      Shortly thereafter, ERS's Washington, D.C. employees began to tender their resignations in order to join White at Resolution.  On July 28, 2015, six Washington, D.C. L&E Group employees resigned to take positions with Resolution.   On July 29, 2015, one

Washington, D.C. L&E Group employee resigned to take a position with Resolution.  On August 3, 2015, two more Washington, D.C. L&E Group employees resigned.  As of this date, all but one of the Washington, D.C. L&E Group's ten employees has formally resigned to take a position with Resolution.  The only employee who has not yet resigned has been out of the country for three weeks and returns on August 10, 2015.

10.     ERS has already begun to receive formal notices from clients that the clients' files should be transitioned to White and Resolution.  These actions were driven by Defendants.  For example, on August 4, 2015, an ERS client with no current active engagements emailed L&E Group members at their new Resolution email addresses with new work opportunities.  Since there was no active engagement requiring communication, the only likely way this client would have known that these former ERS employees began work with Resolution a day earlier would have been if Defendants approached them first.

## THE PARTIES

11.     Plaintiff, Economic Research Services, Inc., is a corporation organized under the laws of the State of Florida with offices located in San Francisco, California; Los Angeles, California; Tallahassee, Florida; and Washington, D.C.

12.     Defendant, Resolution Economics, LLC is a limited liability corporation formed under the laws of the State of California with offices located in Los Angeles, California; Chicago, Illinois; and Washington, D.C.

13.     Defendant, Paul White, Ph.D., is a resident of the State of Virginia, residing at 1389 Northwyck Court, McLean, Virginia.

14.     Defendant, Ali Saad, Ph.D., is a resident of the State of California and the managing member of defendant, Resolution Economics, LLC.  Saad has a business address of 9777 Wilshire Boulevard, Beverly Hills, California.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because of the claims asserted herein arising under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

16.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

17.     This Court can also exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) insofar as plaintiff's state law claims derive from a common nucleus of operative facts as its federal law claims and form a part of the same case or controversy.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this district.

## BACKGROUND

19.     ERS provides economic research and statistical analysis across a range of fields, including data analytics, economic damages, employment discrimination, fair lending, insurance coverage, intellectual property, OFCCP compliance, and wage & hour.  Companies and law firms contract with ERS to provide expert services for, among other things, litigation.

20.     Though a client may request the services of a specific expert, any contract entered into by the client and ERS is between the client and ERS, not the client and any particular expert employee of ERS.

21.     White was employed by ERS, in various positions, for a period of nearly twenty-two years.  Most recently, White was employed as a managing director of ERS's labor and employment practice area, working out of ERS's Washington, D.C. office.

22.     Until Defendants' corporate raiding, ERS's Washington, D.C. L&E Group had a staff of ten employees, including directors, principals, consultants, and analysts.

23.     White's base salary as a Managing Director was $700,000.00 per year.  With Incentive Compensation added to White's base salary, at the time of his departure ERS was paying White in excess of $1,000,000.00 annually.

24.     Overall, the annual compensation for White and the L&E Group exceeded $3,000,000.00.

25.     White was first hired by ERS in August 2, 1993, as an economist.  Over his twenty-two year career with ERS,  White was promoted on a number of occasions: (a) to Research Economist in 1997; (b) Vice President/Research Economist in 1998; (c) to Vice President/Senior Research Economist in 2001; (d) to Director in 2003; and (e) to Managing Director in 2010.

26.     While employed by ERS, White provided services to clients related to, among other things, damages caused by breaches of contractual confidentiality, non-competition, and non-solicitation provisions.

27.     From the inception of his employment with ERS, White was exposed and had access to ERS trade secrets and confidential and proprietary information, including customer lists, preferences and customer contact information, contract information, pricing and financial information, marketing plans and strategies, business plans, talent acquisition plans, business and accounting methods, and SAS computer code, database and software used for performing

complex economic calculations.   As a result, every employment contract White has ever entered into with ERS included provisions related to confidential information and non-solicitation and/or non-competition.

28.     On or about July 5, 1993,  White signed an employment agreement with ERS that included, among other provisions, a non-piracy and a confidentiality and non-disclosure provision, as follows:

> Non-Piracy.   Employee expressly covenants and agrees, which covenants and agreements are of the essence of this contract, that during the term of his contract with [ERS] and for a period of two (2) years following the termination of said contract (whether the termination is voluntary or involuntary), he will not, for himself or in any capacity whatsoever (as an employee, officer, director, stockholder, proprietor, partner, joint venturer, consultant or otherwise) for or on behalf of any other person, firm, partnership, association or corporation, solicit or perform professional services for any person, firm, corporation, or other entity, which is an Employer Client or prospective Employer Client.

> Confidentiality and Non-Disclosure.   It is understood that in the course of Employee's contract with Employer, Employee will become acquainted with Employer Confidential Information. Employee recognizes that Employer Confidential Information has been developed by Employer at great expense, is proprietary to Employer, and is and shall remain the exclusive property of Employer.  Employee agrees that he will not, without the express written consent of Employer, during the term of his contract and for two (2) years after Termination Date, disclose, copy, make any use of, or remove from Employer's premises Employer Confidential Information except as may be required in the course of Employee's contract.

Attached hereto as **Exhibit 1** is a true and accurate copy of White's July 5, 1993, employment agreement.

29.     "Employer Confidential Information" is defined by the July 5, 1993, employment agreement as "the confidential and proprietary information of Employer relating to Employer's

own internal practices and procedures and all information relating to Employer Clients." *See* Exhibit 1 at ¶6.

30. Throughout his employment with ERS, White signed a number of other employment related Agreements which included confidentiality, non-compete and non-solicitation provisions.

31. For example, on January 30, 2014, White signed an Employee Acknowledgement Form that stated, in pertinent part:

> **CONFIDENTIAL AGREEMENT**
>
> As an employee of SourceHOV, I will have access to and may learn certain information of a proprietary or confidential nature.
>
> Such information may include, but is not limited to, customer lists, preferences, and information; contract information; pricing, credit, and financial information; financial statements; marketing plans and strategies; new product developments or plans; business acquisition plans; talent acquisition plans; business, operation, legal, and accounting methods; trade secrets; technical information; software and computer programs; projections, earnings and volume of business information; forms; manuals, and any other data or information relating to the confidential, proprietary or trade secret business of the Company or its representatives, vendors, customers, potential affiliates, and related entities which is not generally known by and readily accessible to the public.
>
> I agree to share such information only with employees of SourceHOV or employees of the Company's parent or affiliates who have a need to know. I agree not to share such information with any other persons, inside or outside the workplace, without prior written consent of SourceHOV during or following employment.
>
> [*See* Exhibit 2.]

32. A true and accurate copy of the January 30, 2014, Employee Acknowledgement Form is attached hereto as **Exhibit 2**.

33.     Most recently, on June 29, 2015, White signed the 2015 Managing Directors'
Compensation Plan.  A true and accurate copy of the 2015 Managing Directors' Compensation
Plan is attached hereto as **Exhibit 3**.

34.     As with White's prior agreements with ERS, the 2015 Managing Directors'
Compensation Plan included confidentiality and non-solicitation provisions.

35.     The confidentiality provision of the 2015 Managing Directors' Compensation
Plan provides, in pertinent part:

> **Confidentiality.**   Director will, during Director's employment
> with ERS and at all times following the date of termination of
> Director's employment with the ERS, treat as strictly confidential
> and safeguard the Confidential Information and not reveal, discuss,
> communicate, publish, use, disclose or disseminate in any manner
> the Confidential Information to any third party, regardless of the
> media on which the Confidential Information is stored or exists
> (such as paper, overhead transparency, computer storage devices,
> etc.), the systems that process it (such as microcomputers,
> mainframes, voice mail systems, etc.), or the methods of
> transmission (such as electronic mail, face-to-face conversations,
> etc.). . . .

> [*See* Exhibit 3 at ¶3(i).]

36.     With regards to use of Confidential Information, the 2015 Managing Directors'
Compensation Plan provides, in pertinent part:

> **Use of Confidential Information.**   Director acknowledges and
> agrees that, as an employee and representative of ERS, Director
> may be given access to Confidential Information that would be
> advantageous to a business competitive with ERS.   Director
> acknowledges that to the extent [he] is given access to Confidential
> Information this creates a special and confidential relationship of
> trust and confidence between Director and ERS.   In order to
> preserve ERS's rights and interests in Confidential Information,
> Director agrees that he will not disclose such Confidential
> Information without express authorization from ERS which ERS
> agrees shall not be unreasonably withheld.   Director further
> acknowledges that ERS has spent considerable time, effort, and
> resources in developing important and invaluable relationships

with its current and prospective customers, clients, referral sources, suppliers, vendors, and employees, and that Director will be provided access to these current and prospective customers, clients, referral sources, suppliers, vendors, and employees, including Confidential Information related to the same, by virtue of Director's employment with ERS. Director further acknowledges and agrees that there is a high risk and opportunity for any person given such responsibility, specialized training, and access to Confidential Information to misappropriate the relationship and goodwill existing between ERS and ERS's current and prospective customers, clients, referral sources, suppliers, vendors, and employees. Director further acknowledges and agrees that all Confidential Information is provided in confidence and constitutes trade secrets and Confidential Information of ERS and that the sale or unauthorized use, disclosure or misappropriation of any of ERS's trade secrets or Confidential Information obtained by Director during Director's employment with ERS constitutes unfair competition. Director therefore acknowledges and agrees that it is fair and reasonable for ERS to take steps to protect itself from the risk of such misappropriation.

[*See* Exhibit 3 at ¶3(j).]

37.     As to non-solicitation, the 2015 Managing Directors' Compensation Plan provides:

**Nonsolicitation.** To protect ERS's trade secrets and Confidential Information, Director agrees that during Director's employment with ERS and for a period of twelve (12) months following the date of termination of Director's employment with ERS, Director will not directly or indirectly do any of the following:

(i) **Hire, or attempt to hire, contact or solicit with respect to hiring or assist in or influence the hiring of**, for Director or on behalf of any other person, company or entity, any employee, sales representative or consultant of ERS, who worked for or was providing services to ERS at any time during Director's employment with ERS provided, that this clause (i) shall not apply to any individual who initiates contact with Director or applies for a position through a general public solicitation for employment;

(ii) **Solicit, divert or take away, or attempt to solicit, divert or take away** (including, without limitation as an employee or independent contractor) any customers, clients, referral

sources, business, or accounts of ERS, with whom Director worked with, serviced, contacted, called upon, met, or communicated with, or was given trade secrets, Confidential Information or third party information about during Director's employment with ERS. The parties agree that this provision does not preclude[] Director from providing services to customers, clients, or referral sources who contact Director and seek to utilize Director's services;

*      *      *

(iv) **Do any act that Director knew, knows, or reasonably should have known might directly injure ERS** or its parents and affiliates in any material respect[.]

[*See* Exhibit 3 at ¶3(k)(emphasis supplied).]

## WHITE'S RESIGNATION AND BREACHES OF HIS CONFIDENTIALITY AND NON-SOLICITATION OBLIGATIONS

A. Breach of Confidentiality and Non-Solicitation of Customers

38.   White resigned from ERS, via email, on July 6, 2015. The email resignation letter stated that White's last day working at ERS would be July 17, 2015. A true and accurate copy of the July 6, 2015, email resignation from White is attached hereto as **Exhibit 4**.

39.   White's email resignation letter further stated that he was leaving ERS to open and manage a new Washington, D.C. office for ERS competitor, Resolution. *See* Exhibit 4.

40.   At the time of his resignation, White was working on approximately fifteen (15) ongoing engagements, with an additional two dozen inactive engagements that could become active again.

41.   Following White's resignation, ERS agreed to work with White to create a subcontractor arrangement to permit White to service any ongoing engagements White had with ERS clients after White's departure from ERS. For litigation matters, such an arrangement was

important, as once White issued an expert opinion or was deposed in any ongoing litigation, it would be difficult, if not impossible, for the client to switch to a new expert witness.

42.     On White's last day with ERS, July 17, 2015, at approximately 6:40 p.m., Resolution sent out an email blast announcing that White would be joining Resolution as a partner, heading Resolution's Washington, D.C. office.  A true and accurate copy of the July 17, 2015, email blast, redacted to remove confidential client information, is attached hereto as **Exhibit 5**.

43.     On information and belief, the July 17, 2015, email blast was sent directly to ERS's customers.  The identity, along with the contact information, of many of ERS's clients is not in the public domain.

44.     The identity of ERS's customers and their non-public contact information is a statutorily protected trade secret and qualifies as Confidential Information under the 2015 Managing Directors' Compensation Plan.  White had no authorization to (1) download a copy of ERS's customer list from ERS's computer network or (2) to provide the information to Resolution.

45.     In addition, the July 17, 2015, email blast constitutes an attempt to solicit, divert or take away a customer of ERS with whom the Washington, D.C. L&E Group worked in violation of the 2015 Managing Directors' Compensation Plan.

46.     ERS has already begun to receive formal notices from clients that the clients' files should be transitioned to White and Resolution.  These actions were driven by Defendants.  For example, on July 29, 2015, White reached out to counsel for one of ERS's clients to inform counsel that White and the L&E Group had left ERS and joined Resolution.  White did not wait for the client to contact him, as required by the 2015 Managing Director's Compensation Plan,

but instead actively reached out to the client, solicited business, and requested that the client approve a transfer of the client's files from ERS to Resolution.  A true and accurate copy of the July 29, 2015, email, redacted to remove confidential client information, is attached hereto as **Exhibit 6.**

47.     Similarly, on August 4, 2015, an ERS client with no current active engagements emailed L&E Group members at their new Resolution email addresses with new work opportunities.  Since there was no active engagement requiring communication, the only likely way this client would have known that these former ERS employees began work with Resolution a day earlier would have been if Defendants approached them first.

48.     On August 5, 2015, one of the Washington, D.C. L&E Group employees emailed an ERS affiliate to inform him of the Washington, D.C. L&E Group's defection to Resolution. In his email, the former ERS employee discusses a meeting he had with the affiliate a week earlier, while still employed by ERS, regarding continued work for the affiliate.  The L&E Group employee did not inform the affiliate at the time of his planned and imminent departure, knowing that he intended to bring any work generated along with him to Resolution.  A true and accurate copy of the August 5, 2015, email is attached hereto as **Exhibit 7.**

B. Breach of Non-Solicitation of Employees

49.     After receiving White's resignation letter, ERS spoke with Saad about potentially selling its Washington, D.C. L&E Group and related infrastructure to Resolution.

50.     At first, Saad expressed interest in the offer.  But then, unwilling to engage in a legitimate transaction to acquire the Washington, D.C. L&E Group, Saad responded that ERS's employees can simply leave and work elsewhere.

51.     In short, Saad threatened to take over ERS's business operations by raiding the remainder of ERS's Washington, D.C. L&E Group employees.

52.     Days later, Saad made good on his threat.  In late July and early August 2015, the Washington, D.C. L&E Group resigned *en masse* from their employment with ERS to go work in the new office Resolution opened down the road.

53.     At 10:28 a.m. on July 28, 2015, Victoria Dritsos, a Senior Database Analyst at ERS, resigned from her employment at ERS.  A true and accurate copy of Dritsos's letter of resignation is attached hereto as **Exhibit 8**.

54.     At 11:20 a.m. on July 28, 2015, Rick Holt, a Principal at ERS, resigned from his employment at ERS.  A true and accurate copy of Holt's letter of resignation is attached hereto as **Exhibit 9**.

55.     At 12:03 p.m. on July 28, 2015, John Fahr, a Principal at ERS, resigned from his employment at ERS.  A true and accurate copy of Fahr's letter of resignation is attached hereto as **Exhibit 10**.

56.     At 2:29 p.m. on July 28, 2015, Edward Bierhanzl, a Principal at ERS, resigned from his employment at ERS.  A true and accurate copy of Bierhanzl's letter of resignation is attached hereto as **Exhibit 11**.

57.     At 4:00 p.m. on July 28, 2015, Kevin Weissman, a Senior Database Analyst at ERS, resigned from his employment at ERS.  A true and accurate copy of Weissman's letter of resignation is attached hereto as **Exhibit 12**.

58.     At 4:07 p.m. on July 28, 2015, Julie Frizell, a Senior Consultant / Economist at ERS, resigned from her employment at ERS.  A true and accurate copy of Frizell's letter of resignation is attached hereto as **Exhibit 13**.

59.     At 3:13 p.m. on July 29, 2015, March Sanchez, an Office Manager at ERS, resigned from his employment at ERS.   A true and accurate copy of Sanchez's letter of resignation is attached hereto as **Exhibit 14**.

60.     On Monday, August 3, 2015, Rabin Das, a Senior Database Analyst at ERS, resigned from his employment at ERS.   A true and accurate copy of Das's letter of resignation is attached hereto as **Exhibit 15**.

61.     On Monday, August 3, 2015, Karen Calderon, a Senior Database Analyst at ERS, resigned from her employment at ERS.   A true and accurate copy of Calderon's letter of resignation is attached hereto as **Exhibit 16**.

62.     Only one employee of the Washington, D.C. L&E Group has not yet resigned, and ERS anticipates receiving his resignation upon his return from vacation.

63.     Each of these employees worked with and under White in ERS's labor and employment practice area.   White either actively solicited the Washington, D.C. L&E Group to join Resolution or, at the least, influenced Resolution to hire them in breach of his non-solicitation obligations.

64.     Accordingly, as a result of Defendants' bad faith actions, ERS's Washington, D.C. office has been decimated.

65.     Defendants' actions have caused irreparable harm to ERS's business.

## COUNT ONE
### (Breach of Contract – White)

66.     ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

67.     White was contractually obligated not to use or disclose ERS's confidential or proprietary information.

68.     White was also contractually prohibited from directly or indirectly soliciting ERS clients.   The contractual prohibition included, but was not limited to, the 2015 Managing Directors' Compensation Plan which forbids White, for a period of twelve (12) months following termination of his employment with ERS, from soliciting, or attempting to solicit, any business from ERS's clients of prospective clients.

69.     White was also contractually prohibited from directly or indirectly soliciting ERS employees.   The contractual prohibition included, but was not limited to, the 2015 Managing Directors' Compensation Plan which forbid White, for a period of twelve (12) months following termination of his employment with ERS, from hiring or assisting in or influencing the hiring of, any employee of ERS.

70.     White was also contractually prohibited under the 2015 Managing Directors' Compensation Plan from using or disclosing any of ERS's proprietary and/or confidential information.

71.     White was also contractually prohibited under the 2015 Managing Directors' Compensation Plan from, directly or indirectly, taking any action that he knew, or reasonably should have known might directly injure ERS or its parents and affiliates in any material respect.

72.     The non-solicitation provisions are narrowly drawn to protect ERS's legitimate business interests.

73.     The non-solicitation provisions are not unduly harsh and oppressive in that they do not curtail White's ability to earn a living.  As described more fully above, White (with Saad and Resolution's assistance) has breached these non-solicitation provisions by hiring, attempting to hire, contacting or soliciting with respect to hiring, or assisting in or influencing the hiring of, ERS employees by Resolution.  As described more fully above, White (with Saad and

Resolution's assistance) has also breached these non-solicitation provisions by soliciting, diverting, taking away, or attempting to solicit, divert, or take away, ERS customers for the benefit of Resolution.

74.    As described more fully above, White (with Saad and Resolution's assistance) has taken actions designed to directly injure ERS and in breach of his contractual confidentiality and non-solicitation obligations.

WHEREFORE, ERS demands judgment against White:

A.  Restraining and enjoining White for a period of twelve (12) months from directly or indirectly doing any of the following:

(i) Hiring, attempting to hire, contacting or soliciting with respect to hiring or assisting in or influencing the hiring of, any employee, sales representative or consultant of ERS, who worked for or was providing services to ERS at any time during White's employment with ERS;

(ii) Soliciting, diverting or taking away, or attempting to solicit, divert or take away (including, without limitation as an employee or independent contractor) any customers, clients, referral sources, business, or accounts of ERS;

B.  Restraining and enjoining White from using, disclosing, or otherwise utilizing any and all information that is proprietary and/or confidential, secret or otherwise not generally known to those in ERS's industry and pertains directly or indirectly to ERS and its operations and activities, products, services, employees, contractors, consultants and suppliers, including any and all formulae, methods, techniques, processes, know-how and data, technical or non-technical, whether written, graphic, computer-generated or orally furnished to White by ERS or any of ERS's authorized representatives;

C.  Requiring White to preserve any and all documents and communications of any type that relate to:

(i) ERS's existing and prospective clients including, but not limited to, those clients with whom White or any other former ERS employees currently employed by Resolution had contact during their ERS employment;

(ii) ERS confidential and proprietary information including, but not limited to, that relating to ERS's business, its operations, strategies, existing and prospective clients, proprietary software code and databases, and current and former employees;

(iii) Offers to and terms of employment for any former ERS employees currently employed by Resolution; and

(iv) The potential employment of any ERS employee;

D. Requiring White to:

(i) Return any and all papers or documents containing the information described in C. above or documents containing ERS's confidential information, whether in hard copy or electronic form; and

(ii) Completely and permanently delete any remaining ERS confidential information maintained in electronic form from any computer system owned, controlled, or operated by any Defendant;

E. Awarding compensatory damages;

F. Awarding consequential damages;

G. Awarding interest as allowed by law;

H. Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT TWO
### (Civil Conspiracy – All Defendants)

75.     ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

76.     Defendants entered into a conspiracy by agreeing with each other to wrongfully and tortiously seize and pirate the business identity, technical expertise, employees and clients of the L&E Group.

77.     Defendants agreed to participate, understood the general objectives of the scheme, as described above, accepted them, and agreed to do their part to further them.

78.     The co-conspirators, with malice, have engaged in, or have aided and abetted the commission of, numerous overt acts in furtherance of the conspiracy, including the unauthorized use and disclosure of ERS confidential and proprietary information, and the calculated targeting, solicitation and diversion of ERS's clients and employees.

79.     As a result of Defendants' conspiratorial actions, ERS has suffered damages.

WHEREFORE, ERS demands judgment against Defendants:

A.  Restraining and enjoining Defendants for a period of twelve (12) months from directly or indirectly doing any of the following:

  (i) Hiring, attempting to hire, contacting or soliciting with respect to hiring or assist in or influencing the hiring of, any employee, sales representative or consultant of ERS, who worked for or was providing services to ERS at any time during White's employment with ERS;

  (ii) Soliciting, diverting or taking away, or attempting to solicit, divert or take away (including, without limitation as an employee or independent contractor) any customers, clients, referral sources, business, or accounts of ERS;

B.  Restraining and enjoining Defendants from using, disclosing, or otherwise utilizing any and all information that is proprietary and/or confidential, secret or otherwise not generally known to those in ERS's industry and which pertains, directly or indirectly to ERS and its operations and activities, products, services, employees, contractors, consultants and suppliers, including any and all formulae, methods, techniques, processes, know-how and data, technical or non-technical, whether written, graphic, computer-generated or orally furnished to White by ERS or any of ERS's authorized representatives;

C. Requiring Defendants to preserve any and all documents and communications of any

type that relate to:

(i) ERS's existing and prospective clients including, but not limited to, those clients with whom White or any other former ERS employees currently employed by Resolution had contact during their ERS employment;

(ii) ERS's confidential and proprietary information including, but not limited to, that relating to ERS's business, its operations, strategies, existing and prospective clients, proprietary software code and databases, and current and former employees;

(iii) Offers to and terms of employment for any former ERS employees currently employed by Resolution; and

(iv) The potential employment of any ERS employee;

D. Requiring Defendants to:

(i) Return any and all papers or documents containing the information described in C. above or documents containing ERS confidential information, whether in hard copy or electronic form; and

(ii) Completely and permanently delete any remaining ERS confidential information maintained in electronic form from any computer system owned, controlled, or operated by any Defendant;

E. Awarding compensatory damages;

F. Awarding consequential damages;

G. Awarding punitive damages;

H. Awarding attorneys' fees and costs; and

I. Awarding such other relief as the Court may deem just, equitable and proper.

## COUNT THREE
### (Aiding and Abetting – Saad and Resolution)

80. ERS repeats and re-alleges each of the allegations contained in the foregoing

paragraphs as if fully set forth herein at length.

81.     White has performed numerous unlawful and tortious acts that have injured ERS, including, but not limited to, breaching the non-solicitation and confidentiality agreements and intentionally interfering with ERS's contractual and business relations.

82.     Saad and Resolution, with malice, knowingly and intentionally assisted White in committing the unlawful and tortious acts set forth herein.

83.     Saad and Resolution were aware that they were assisting White in unlawful and tortious conduct at the time they provided White with assistance.

84.     ERS has been damaged as a result of Saad's and Resolution's actions.

WHEREFORE, ERS demands judgment against Defendants:

A. Restraining and enjoining Defendants for a period of twelve (12) months from directly or indirectly doing any of the following:

   (i) Hiring, attempting to hire, contacting or soliciting with respect to hiring or assisting in or influencing the hiring of, any employee, sales representative or consultant of ERS, who worked for or was providing services to ERS at any time during White's employment with ERS;

   (ii) Soliciting, diverting or taking away, or attempting to solicit, divert or take away (including, without limitation as an employee or independent contractor) any customers, clients, referral sources, business, or accounts of ERS;

B. Restraining and enjoining Defendants from using, disclosing, or otherwise utilizing any and all information that is proprietary and/or confidential, secret or otherwise not generally known to those in ERS's industry and pertains directly or indirectly to ERS and its operations and activities, products, services, employees, contractors, consultants and suppliers, including any and all formulae, methods, techniques, processes, know-how and data, technical or non-technical, whether written, graphic, computer-generated or orally furnished to White by ERS or any of ERS's authorized representatives;

C. Requiring Defendants to preserve any and all documents and communications of any type that relate to:

    (i) ERS's existing and prospective clients including, but not limited to, those clients with whom White or any other former ERS employees currently employed by Resolution had contact during their ERS employment;

    (ii) ERS's confidential and proprietary information including, but not limited to, that relating to ERS's business, its operations, strategies, existing and prospective clients, proprietary software code and databases, and current and former employees;

    (iii) Offers to and terms of employment for any former ERS employees currently employed by Resolution; and

    (iv) The potential employment of any ERS employee;

D. Requiring Defendants to:

    (i) Return any and all papers or documents containing the information described in C. above or documents containing ERS confidential information, whether in hard copy or electronic form; and

    (ii) Completely and permanently delete any remaining ERS confidential information maintained in electronic form from any computer system owned, controlled, or operated by any Defendant;

E. Awarding compensatory damages;

F. Awarding consequential damages;

G. Awarding punitive damages;

H. Awarding attorneys' fees and costs; and

I. Awarding such other relief as the Court may deem just, equitable and proper.

## COUNT FOUR
### (Intentional Interference with Contractual Relations – All Defendants)

85.    ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

86.     ERS maintains agreements creating a contractual relationship with its clients to provide services.

87.     Defendants have knowledge of ERS's contractual relationships with its clients.

88.     By soliciting ERS's customers and employees, Defendants, with malice, have intentionally interfered with ERS's contracts with its customers by preventing ERS from fulfilling its contractual obligations to its customers.

89.     As a result of Defendants' tortious actions, ERS has suffered damages.

WHEREFORE, ERS demands judgment against Defendants:

A.  Awarding compensatory damages;

B.  Awarding consequential damages;

C.  Awarding punitive damages;

D.  Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT FIVE
### (Intentional Interference with Business Relations –
### All Defendants)

90.     ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

91.     ERS maintains business relationships with each of its customers and has an expectancy of a continuing business relationship with its customers serviced by the L&E Group and a probability of future economic benefit to ERS.

92.     ERS further maintains business relationships with each of its employees and has an expectancy of a continuing business relationship with its employees and a probability of future economic benefit to ERS.

93.     Defendants have knowledge of ERS's business relationships with its clients and employees.

94.     Defendants, with malice, interfered with ERS's business relations using illegal, unlawful, and/or tortious means.

95.     Absent Defendants' intentional misconduct, ERS would have continued in the relationship with its customers and employees.

96.     As a result of Defendant's actions, ERS has suffered damage.

WHEREFORE, ERS demands judgment against Defendants:

    A.  Awarding compensatory damages;

    B.  Awarding consequential damages;

    C.  Awarding punitive damages;

    D.  Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT SIX
### (Tortious Interference with Non-Solicitation Agreement – Saad and Resolution)

97.     ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

98.     White's agreements with ERS contained a non-solicitation provision that prohibited him from soliciting ERS's clients and employees.

99.     Saad and Resolution had notice of White's non-solicitation obligations.

100.    Saad and Resolution, with malice, tortiously interfered with White's agreements with ERS.

101.    As a result of Saad and Resolution's tortious conduct, ERS has suffered damages.

WHEREFORE, ERS demands judgment against Saad and Resolution:

   A.  Awarding compensatory damages;

   B.  Awarding consequential damages;

   C.  Awarding punitive damages;

   D.  Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT SEVEN
### (Unfair Competition – All Defendants)

102.   ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

103.   Defendants have systematically induced ERS's employees to leave their present employment with the purpose of crippling and destroying a critical part of ERS's labor and employment practice area.

104.   The inducement was made with malice and the intent of illicitly seizing and pirating ERS's business identity, its trade secrets and confidential information, technical expertise, employees and clients.

105.   As a result of Defendants' conduct, ERS has suffered damages.

WHEREFORE, ERS demands judgment against Defendants:

   A.  Awarding compensatory damages;

   B.  Awarding consequential damages;

   C.  Awarding punitive damages;

   D.  Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT EIGHT
### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030 – All Defendants)

106.   ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

107.    White, for the benefit of Resolution and in connection with a conspiracy with Saad, accessed ERS's computers without authorization or in excess of authorized access in order to order to obtain access to ERS's confidential information.

108.    On information and belief, Saad, on behalf of Resolution and in connection with a conspiracy with White, directed White, while ostensibly still employed by ERS, to access ERS's computer systems to unlawfully copy and remove ERS data for the benefit of Defendants.

109.    On information and belief, White, for the benefit of Resolution and in connection with a conspiracy with Saad, directed the L&E Group, while ostensibly still employed by ERS, to access ERS's computer systems to unlawfully copy and remove ERS data for the benefit of Defendants.

110.    ERS's computers are used in connection with interstate commerce, as ERS does business with clients throughout the country.

111.    As a result of White's unauthorized access of ERS's computers, ERS has suffered loss aggregating in excess of $5,000 in value.

WHEREFORE, ERS demands judgment against Defendants:

A.   Awarding injunctive relief;

B.   Awarding compensatory damages;

C.   Awarding consequential damages;

D.   Awarding such other relief as the Court may deem just, equitable and proper.

## COUNT NINE
### (Uniform Trade Secrets Act, D.C. Code §36-401, et seq. – All Defendants)

112.    ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

113.    ERS owns certain confidential information, including information related to ERS's customers, as well as proprietary formulas, software code and databases used for performing expert economist services and calculations for its clients, which constitute protected trade secrets.  White was exposed to all of these trade secrets during his employment at ERS.

114.    White has disclosed and used the trade secrets of ERS without the implied or express consent of ERS.

115.    White acquired access to ERS's trade secrets under a contractual duty to maintain its secrecy.

116.    Saad and Resolution acquired access to ERS's trade secrets, including, but not limited to, ERS's confidential customer information without ERS's permission from White, a person who owed a duty to maintain the secrecy of ERS's trade secrets.

117.    With malice, Defendants have misappropriated ERS's trade secrets with the purpose of crippling and destroying a critical part of ERS's labor and employment practice area and pirating ERS's business identity.

118.    Accordingly, Defendants have violated the District of Columbia Uniform Trade Secrets Act.

WHEREFORE, ERS demands judgment against Defendants:

A.  Enjoining Defendants from use or disclosure of ERS's trade secrets;

B.  Awarding damages equaling ERS's actual losses;

C.  Awarding compensatory damages;

D.  Awarding consequential damages;

E.  Awarding punitive damages;

F.  Awarding attorneys' fees and costs;

G. Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT TEN
### (Breach of Fiduciary Duty – White)

119.    ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

120.    As a managing director of ERS, White owed both contractual and common law fiduciary duties to ERS.

121.    While still employed by ERS, White took steps to raid ERS's business for the benefit of a competitor of ERS, including providing the competitor with confidential client information and assisting in the solicitation of ERS's employees and clients.

122.    By virtue of the conduct detailed above, White breached his fiduciary duty to ERS.

123.    White's actions have caused ERS to suffer damages.

WHEREFORE, ERS demands judgment against White:

A. Awarding compensatory damages;

B. Awarding consequential damages;

C. Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT ELEVEN
### (Fraud in the Inducement/Fraudulent Non-Disclosure – White)

124.    ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

125.    On June 29, 2015, ERS and White entered into the 2015 Managing Directors' Compensation Plan.  At the time, upon information and belief, White intended to resign from

ERS and solicit both ERS's clients and employees for his own benefit and that of Resolution and Saad.

126.    Among other things, the 2015 Managing Directors' Compensation Plan, at White's insistence, diluted White's non-solicitation obligations.

127.    At no time prior to entering into the agreement did White disclose his intention to resign and take with him ERS's key employees and clients.

128.    White's failure to disclose his intent to ERS was malicious and was intended to keep ERS ignorant of the facts.

129.    Had ERS known the facts as set forth above, it would not have modified White's non-solicitation obligations.

130.    ERS's actions and beliefs, described above, were reasonable under the circumstances.

131.    As a result of White's conduct, ERS has been severely damaged.

WHEREFORE, ERS demands judgment against White:

A.  Declaring the 2015 Managing Directors' Compensation Plan to be ineffectual and void;

B.  Awarding compensatory damages;

C.  Awarding consequential damages;

D.  Awarding punitive damages;

E.  Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT TWELVE
### (Covenant of Good Faith and Fair Dealing – White)

132.    ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

133.   Every contract contains an implied covenant of good faith and fair dealing that prohibits the parties to the contract from doing anything which would have the effect of destroying or injuring the right of the other part to receive the fruits of the contract.

134.   White entered into contracts with ERS in which he agreed to not disclose ERS's confidential information, and to not solicit ERS's employees or clients.

135.   By resigning days after entering into the agreement and thereafter immediately disclosing ERS's confidential information and soliciting ERS's employees and clients for the benefit of a competitor, White has violated the contractual covenant of good faith and fair dealing and has caused ERS to suffer harm.

WHEREFORE, ERS demands judgment against White:

   A. Awarding compensatory damages;

   B. Awarding consequential damages;

   C. Awarding interest as allowed by law;

   D. Awarding such other relief as the Court may deem just, equitable, and proper.

## COUNT THIRTEEN
### (Accounting – All Defendants)

136.   ERS repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein at length.

137.   By tortiously soliciting ERS's employees and customers and raiding ERS's business operations, Defendants have damaged ERS's business.

138.   The foregoing conduct has resulted in a loss of revenues and profits to ERS and continues to cause damages to ERS.

WHEREFORE, ERS demands judgment against Defendants:

A. Compelling Defendants to provide Plaintiff with an accounting of all revenues and profits they have received from or in connection with any current or former client of ERS;

B. Awarding compensatory damages;

C. Awarding attorneys' fees and costs of suit;

D. Awarding such other relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

ERS hereby demands a trial by jury as to all issues so triable.

Dated: August 10, 2015

ECONOMIC RESEARCH SERVICES, INC.
By Counsel

W. Michael Holm (D.C. Bar No. 387808)
Leslie P. Machado (D.C. Bar No. 472395)
LeClairRyan
2318 Mill Road, Suite 1100
Alexandria, VA  22314
(703) 647-5927

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP

Attorneys for Plaintiff
Economic Research Services, Inc.

## VERIFICATION

Ronald Cogburn, of full age, being duly sworn according to law, upon his oath deposes and says:

1.     I am the Chief Executive Officer of SourceHOV, the parent company of plaintiff, Economic Research Services, Inc., and am authorized to make this verification on Economic Research Services, Inc.'s behalf.

2.     The allegations set forth in this Verified Complaint are true to the best of my personal knowledge except as to those allegations which are made upon information and belief.

3.     As to the allegations made upon information and belief, I believe those to be true.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on August 10 2015.

_____
Ronald Cogburn