UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ECONOMIC RESEARCH SERVICES, INC., )
)
      **Plaintiff,** )
)
v. ) Civil Case No.
) 1:15-cv-1282 (RJL)
RESOLUTION ECONOMICS, LLC, )
PAUL WHITE, AND ALI SAAD, )
)
      **Defendants.** )

FILED
OCT 21 2015
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

<u>MEMORANDUM OPINION</u>
(October 19, 2015) [Dkts. #3, #22]

Plaintiff Economic Research Services ("plaintiff" or "ERS") commenced the instant action against defendants Resolution Economics LLC ("Resolution"), Paul White ("White"), and Ali Saad (collectively, "defendants") in August 2015. ERS alleges, in a thirteen-count Verified Complaint, that White, a former employee, violated the terms of his employment agreement by disseminating ERS's confidential information and by luring ERS's clients and employees to its regional competitor, Resolution Economics. *See* Verified Compl. [Dkt. #1]. Eager to stop the exodus of clients and personnel, ERS sought a preliminary injunction to enjoin defendants from purloining additional information and from further soliciting its client base. *See* Mot. for TRO & Prelim. Inj. & Br. in Supp. of Economic Research Servs., Inc.'s Appl. for a TRO & a Prelim. Inj. (Pl.'s Mem.") [Dkt. #3]; Defs.' Mem. of Law in Opp'n to

1

Pl.'s Mot. for a Prelim. Inj. ("Defs.' Mem.") [Dkt. #19].[1] Upon consideration of the pleadings, the relevant case law, and the entire record herein, the Court DENIES plaintiff's motion in its entirety.[2]

## BACKGROUND

Plaintiff ERS provides economic research and statistical analysis for corporations and law firms in a variety of disciplines, including employment discrimination, fair lending, insurance coverage, and intellectual property. *See* Compl. ¶ 19.[3] Although the events at issue here transpired in ERS's Washington, D.C. office, that is not ERS's only, or even principle, place of business. Indeed, ERS, which is a subsidiary of parent corporation SourceHOV, is headquartered in Florida and contains two outposts in California, both of which have sizeable Labor and Employment practices. White Decl. ¶ 3 [Dkt. #19-1]. Defendant Resolution operates in the same Labor and Employment consulting milieu. Since its founding nearly twenty years ago, Resolution has established offices in Los Angeles, Chicago, and Washington, D.C., and has built, moreover, a respected practice furnishing expert

---

[1] Although Judge Ketanji Brown Jackson entered a Temporary Restraining Order in her capacity as Motions Judge on August 13, 2015, *see* Order [Dkt. #14], I vacated that Order on August 31, 2015, *see* Hr'g Tr. at 43:8-10 [Dkt. #23].

[2] Also before the Court is defendants' Motion to Strike Reply Brief and Declarations Filed in Violation of Local Rule 65 [Dkt. #22]. Local Rule 65.1(c) requires that the party moving for a preliminary injunction seek leave of the Court before filing supplemental affidavits in support of its reply brief. *See* LCvR 65.1(c). ERS did not do so here. The Court, accordingly, will GRANT defendants' Motion and exclude both plaintiff's Reply Brief in Further Support of Economic Research Services, Inc.'s Application for a Preliminary Injunction [Dkt. #21] and the supplemental affidavits appended thereto.

[3] A verified complaint is treated as an affidavit to the extent it is based on personal knowledge and

witness services in labor and employment disputes, as well as financial consulting in matters concerning "human resource management, wage and hour issues, and accounting." Saad Decl. ¶ 2 [Dkt. #19-2].

Before his move to Resolution, defendant White was a demonstrably important part of ERS's Washington, D.C. Labor and Employment practice. White began his twenty-two year stint at ERS in 1993, when he was hired as an Economist. Compl. ¶¶ 21, 25. He thereafter moved up the ranks, receiving a promotion to Vice President in 1998 before ultimately becoming a Managing Director in the Washington, D.C. office of ERS's Labor and Employment group in 2010. Compl. ¶¶ 21, 25. As a condition of his employment, White signed numerous contracts with ERS, the most recent of which was consummated on June 29, 2015 (the "2015 Employment Agreement" or the "Agreement"). Compl. Ex. 3 [Dkt. #1-3]; see Compl. ¶¶ 28-32; see also Compl. Ex. 1 [Dkt. #1-1]; Compl. Ex. 2 [Dkt. #1-2]. The 2015 Employment Agreement contains several restrictive covenants, only a few of which are relevant here. First, the Agreement bars Directors from disclosing ERS's confidential information to third parties at any time following their departure from ERS.[4] Compl. Ex. 3 § 3(i). Second, it prohibits Directors from soliciting ERS

---

sets forth facts admissible in evidence. *See Neal v. Kelly*, 963 F.2d 453, 457-58 (D.C. Cir. 1992).
[4] The Agreement states in relevant part: "Director will, during Director's employment with ERS and at all times following the date of termination of Director's employment with ERS . . . not reveal, discuss, communicate, publish, use, disclosure or disseminate in any manner [ERS's] Confidential Information to any third party. . ." Compl. Ex. 3 § 3(i); *see also id.* at § 3(j) ("In order to preserve ERS's rights and interests in Confidential Information, Director agrees that he will not disclose such

employees or clients for the twelve months following their separation.[5]  Compl. Ex. 3 §§ 3(k)(i)-(ii).  Third, and finally, the Agreement precludes Directors, once again for a period of twelve months after leaving ERS, from performing "any act that [the] Director[s] knew, know[], or reasonably should have known . . . might directly injure ERS or its parents and affiliates in any material respect."  Compl. Ex. 3 § 3(k)(iv).

On July 6, 2015, shortly after signing the 2015 Employment Agreement, White resigned his position at ERS and, effective July 17, 2015, left to manage Resolution's nascent Washington, D.C. office.  Compl. ¶¶ 38-39; Compl. Ex. 4 [Dkt. #1-4].  After apprising ERS of his resignation, but shortly before leaving ERS, White generated a list of the clients he had serviced during his tenure at ERS.  White Decl. ¶ 43.  While ERS contends that White's actions were tantamount to misappropriation, defendants maintain that there is nothing untoward about reverse-engineering, as White purportedly did here, a client list from memory.  Indeed, White avers that he compiled the offending list "one evening at home" by jotting down the "contacts that

---

Confidential Information without express authorization from ERS.").
[5] Specifically, the 2015 Employment Agreement prevents Directors from doing any of the following: "Hir[ing], or attempt[ing] to hire, contact or solicit with respect to hiring or assist in or influence the hiring of, for Director or on behalf of any other person, company or entity, any employee . . . who worked for or was providing services to ERS at any time during Director's employment with ERS provided, that this clause (i) shall not apply to any individual who initiates contact with Director or applies for a position through a general public solicitation for employment."  Compl. Ex. 3 § 3(k)(i). The client non-solicitation clause likewise precludes Director from doing any of the following: "Solicit[ing], divert[ing] or tak[ing] away, or attempt[ing] to solicit, divert or take away . . . any customers, clients, referral sources, business, or accounts of ERS, with whom Director worked with, serviced, contacted, called upon, met, or communicated with . . . during Director's employment with ERS.  The parties agree that this provision does not preclude[] Director from providing services to

[he] had at [client] law firms, public agencies and in-house legal and human resources departments." White Decl. ¶ 43. Where his memory failed, White supplemented the list by combing through his LinkedIn contacts and performing targeted Internet searches. White Decl. ¶ 43. For a number of the clients on his list, White included email addresses that he either recalled from memory or located through publicly-available sources. White Decl. ¶ 43. White then tendered the list to Resolution, which conducted its own searches to find, and catalogue, the email addresses of the remaining clients whose contact information White was unable to independently verify. Hurtado Decl. ¶ 5 [Dkt. #19-3]. Thereafter, on July 17, 2015, Resolution emailed the individuals on White's reconstructed list, announcing that White would be joining Resolution as a Partner and furnishing his updated contact information. Compl. ¶¶ 42, 46; Compl. Ex. 5 [Dkt. #1-5]. According to ERS, the announcement had its desired effect. Shortly after Resolution sent the email, ERS began to receive formal notices from its clients requesting that their files be transitioned to Resolution. *See* Compl. ¶ 46.

This exodus was not limited to ERS's clients. In the wake of White's resignation, several other members of ERS's Washington, D.C. Labor and Employment group, all of whom had worked for White, quit their jobs at ERS and

---

customers, clients, or referral sources who contact Director and seek to utilize Director's services." Compl. Ex. 3 §§ 3(k)(ii).

joined Resolution.[6] *See* Compl. ¶ 52. By August 10, 2015, nine of the ten employees in the practice group had resigned their posts. Compl. ¶¶ 53-62. ERS places the blame for this defection squarely at White's feet, asserting that "White either actively solicited the Washington, D.C. [Labor and Employment] Group to join Resolution or, at the least, influenced Resolution to hire them in breach of his non-solicitation obligations." Compl. ¶ 63. ERS contends, in short, that defendants "decimated" its Washington, D.C. office. Compl. ¶¶ 64-65.

ERS commenced this suit on August 10, 2015, alleging breach of contract in addition to numerous commercial torts. *See generally* Compl. That same day, eager to stymie the torrent of client and personnel defections, ERS moved to enjoin defendants from "the use [of] ERS's confidential information" and from "recruiting ERS employees or soliciting business from ERS's clients." Mot. for TRO & Prelim. Inj.; Pl.'s Mem. Defendants timely opposed this request. *See* Defs.' Mem. I heard

---

[6] The first wave of resignations commenced on July 28, 2015, when Victoria Dritsos, a Senior Database Analyst at ERS, tendered her resignation. *See* Compl. ¶ 53; Compl. Ex. 8 [Dkt. #1-8]. Rick Holt, a Principal at ERS, followed suit less than an hour later at 11:20 a.m. *See* Compl. ¶ 54; Compl. Ex. 9 [Dkt. #1-9]. At 12:03 p.m. that same day, John Fahr, another Principal at ERS, tendered his resignation, and at 2:29 p.m. and 4:00 p.m., Principal Edward Bierhanzel and Senior Database Analyst Kevin Weissman respectively resigned their posts. *See* Compl. ¶¶ 55-56; Compl. Exs. 10-12[Dkts. #1-10 – #1-12]. Senior Consultant Julie Frizell, who resigned at 4:07 p.m. was the last to resign that day. *See* Compl. ¶58; Compl. Ex. 13 [Dkt. #1-13]. The onslaught of resignations continued the following day when, less than twenty-four hours after Ms. Frizell's resignation, ERS Office Manager Mark Sanchez resigned his post. *See* Compl. ¶ 59; Compl. Ex. 14 [Dkt. #1-14]. The following Monday, August 3, 2015, brought two additional departures: Robin Das and Karen Calderon, both of whom were Senior Database Analysts at ERS. Compl. ¶¶ 60-61; Compl. Exs. 15-16 [Dkts. #1-15 – #1-16]. As of August 10, 2015, only one employee remained in ERS's Washington, D.C. Labor and Employment group, but ERS "anticipate[d] receiving his resignation upon his return from vacation." Compl. ¶ 62.

oral argument on ERS's Motion on August 31, 2015, *see* August 31, 2015 Minute Entry, and received supplemental briefing from both sides on September 14, 2015, *see* Plaintiff's Supplemental Memorandum of Law in Further Support of Plaintiff's Motion for a Preliminary Injunction [Dkt. #27]; Defendants' Supplemental Brief in Further Opposition to Plaintiff's Motion for a Preliminary Injunction ("Defs.' Suppl. Mem.") [Dkt. #28].

## DISCUSSION

### I. Legal Standard

A preliminary injunction is an "extraordinary remedy" that "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted). Ordinarily, a plaintiff seeking such a remedy must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Courts considering these factors typically do so on a "sliding scale" that balances the relative strengths of each prong. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). Despite this flexibility, it remains incumbent on the movant to demonstrate a quantum of irremediable injury. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Indeed, because irreparable harm has "always" been the touchstone of injunctive relief, *Sampson v. Murray*, 415 U.S. 61, 88 (1974), a movant's failure to demonstrate the requisite injury is grounds for denying a motion for a preliminary injunction, "even if the other three factors" merit relief, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Given that ERS has not demonstrated "irreparable harm," the Court's inquiry begins, and ends, with this factor alone.

## II.   Irreparable harm

Our Circuit Court has articulated a "high standard for irreparable injury." *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. To meet this threshold, the plaintiff's injury must be "both certain and great" and, in all events, beyond remuneration. *Wisc. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Imminence is key to this inquiry, and vague or threadbare allegations of future harm simply will not garner injunctive relief. *Id.* Nor, for that matter, will harms of a purely economic nature. *Wis. Gas Co.*, 758 F.2d at 674 ("[I]t is well settled that economic loss does not, in and of itself, constitute irreparable harm." (citation omitted)). Indeed, because "[m]ere injuries, however substantial, in terms of money, time and energy" are not enough to meet the threshold for irreparable harm, a preliminary injunction will only issue when the injury is utterly, and entirely, beyond compensatory relief. *Sampson*, 415 U.S. at 90 (quoting

8

*Va. Petrol. Jobbers Ass'n v. FPC*, 259 F.2d 921 (1958)). Unfortunately for ERS, the Court is unpersuaded that it has, or will, suffer harm of this magnitude.

ERS contends that it faces "immediate and irreparable harm [from] the unauthorized . . . and threatened use of its confidential and proprietary information and the continued targeting of its customers and employees." Pl.'s Mem. at 18. Even assuming, *arguendo*, that these allegations are true,[7] ERS's losses are hardly irretrievable. By styling its grievance as one of ongoing appropriation, ERS attempts to shoehorn its injury into the aegis of irreparable damage. But common sense suggests otherwise. The gravamen of ERS's Complaint is that Resolution is stealing its clients. Clients, though not fungible in the traditional sense, are, nonetheless, the currency of commercial enterprise. Because they furnish the revenue, goodwill, and promise of future earnings that drive corporate success, their value is reducible to money. Thus, regardless of how ERS has fashioned its claim, its objection is not to client solicitation per se, but rather to its *effect* on ERS's future revenue. ERS's true interest, then, when viewed through the prism of commercial enterprise, is in preventing Resolution from siphoning its future profits. Unfortunately for ERS, economic injuries of this kind are eminently compensable. *See Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 335

---

[7] ERS's likelihood of success on the merits of its breach of contract claim is hardly a foregone conclusion. As illustrated by defendants' strenuous objections to the scope of the contract itself, and by their firm belief in the propriety of their actions, there remain numerous issues of law and fact that must be resolved before this Court can make any dispositive legal determinations.

(D.D.C. 2012) ("The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms."); *see also Berman v. DePetrillo*, No. 97-70, 1997 WL 148638, at *2 (D.D.C. Mar. 20, 1997) (classifying "loss of market" and "loss of business opportunity" as "purely economic" injuries that do not "constitute irreparable harm"); *Clipper Cruise Line, Inc. v. United States*, 855 F. Supp. 1, 4 (D.D.C. 1994) (identifying lost profits and goodwill as compensable economic harms). For that reason, the Court finds that ERS has pled a type of harm that is ordinarily redressable by money damages in the course of litigation.

ERS argues in the alternative that its injury, even if economic, is irreparable because it threatens ERS's existence. I disagree. "Recoverable monetary loss may constitute irreparable harm" but "*only* where the loss threatens the very existence of the movant's business." *See Wis. Gas Co.*, 758 F.2d at 674 (emphasis added). The universe of harms that meet this litmus test is narrow indeed, and courts in this Circuit have been unwilling to find irreparable economic injury where the plaintiff's business remains robust and its employees' livelihoods unaffected. *See, e.g., Express One Int'l, Inc. v. United States Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992) (finding irreparable injury where the monetary loss would cause significant capital costs and employee lay-offs); *McGregor Printing Corp. v. Kemp*, Civ.A. No. 91-3255 (GHR), 1992 WL 118794, at *5 (D.D.C. May 14, 1992) (finding that "the

10

irretrievable monetary loss to [plaintiff] in combination with the loss in employment to [plaintiff's] employees" amounted to irreparable harm). The case law, as such, is abundantly clear: to prevail, ERS must marshal "a strong showing" that the damage to its business is "above and beyond a simple diminution in profits." *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000). Unfortunately for ERS, it has not done so here.

Given the size and prominence of ERS's parent corporation, and the apparent strength of its own infrastructure, this Court has no reason to believe that ERS's alleged losses threaten the company's very existence. *See Ajilon Prof'l Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 & n.6 (D.D.C. 2007) (Leon, J.) (declining to find irreparable harm where the plaintiff, itself a sizeable corporation, was a subsidiary of one of the "world's largest human resource solution providers"). As defendants point out in their supplemental brief, ERS is a subsidiary of a global corporation: SourceHOV. Defs.' Suppl. Mem. at 3; White Decl. ¶ 7; Saad Decl. ¶ 3. ERS, eager to disclaim the importance of this relationship, contends that its connection to SourceHOV is "irrelevant" because "[a]ny harm suffered by ERS as a result of Defendants' conduct cannot be undone by SourceHOV." Pl.'s Suppl. Mem. at 10. The Court is well aware that SourceHOV cannot reverse history. What SourceHOV *can* do, however, is furnish the capital necessary to help ERS recoup its losses. The Court notes, moreover, that ERS is itself a mature player in the

11

consulting industry, having amassed offices in Florida, California, and Washington, D.C, certain of which boast larger Labor and Employment groups than its Washington, D.C. office had prior to the onset of this litigation. *See* Defs.' Suppl. Mem. at 3. It is difficult for the Court to conclude on the basis of these facts that the departure of ten employees, and the defection of clients serviced by defendant White, has crippled ERS's business as a whole. Indeed, ERS has made no showing that defendants' alleged misdeeds will have a systemic effect on the company. For example, there is no evidence that ERS will be forced to lay off personnel in other offices, or that defendants' actions will grossly deplete its capital. ERS has not, in short, persuaded this Court that defendants have jeopardized its existence. Accordingly, I find that a preliminary injunction is inappropriate and need not address the remaining three factors.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendants' Motion to Strike Plaintiff's Reply Brief and Declarations and DENIES plaintiff's Motion for a Preliminary Injunction in its entirety. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge