## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ECONOMIC RESEARCH SERVICES, INC.,**      )
                                           )
     **Plaintiff,**                        )
                                           )
     **v.**                               )   **Civil Case No.**
                                           )   **1:15-cv-1282 (RJL)**
                                           )
**RESOLUTION ECONOMICS, LLC,**             )
**PAUL WHITE, AND ALI SAAD,**              )
                                           )
     **Defendants.**                       )

# FILED

## SEP 2 2 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION

(September **21**, 2016) [Dkt. #29]

Plaintiff Economic Research Services ("plaintiff" or "ERS") commenced the instant action against defendants Resolution Economics, LLC ("Resolution"), Paul White ("White"), and Ali Saad ("Saad") (collectively, "defendants") in August 2015.  In its Verified Complaint[1] ("Complaint") [Dkt. #1], ERS poses a veritable kitchen sink full of claims related to White departing from ERS to Resolution and the corresponding phenomenon of ERS's employees and clients doing the same.  Presently before the Court is defendants' Motion to Dismiss the Complaint in its entirety.  Defs.' Mot. to Dismiss [Dkt. #29].  Upon consideration of the pleadings, the relevant law, and the entire record herein, the Court GRANTS IN PART and DENIES IN PART defendants' Motion for the reasons set forth below.

---

[1] A verified complaint is treated as an affidavit to the extent it is based on personal knowledge and sets forth facts admissible in evidence. *See Neal v. Kelly*, 963 F.2d 453, 457–58 (D.C. Cir. 1992).

## BACKGROUND

Plaintiff ERS provides economic research and statistical analysis for corporations and law firms in a variety of disciplines, including employment discrimination, fair lending, insurance coverage, and intellectual property. *See* Compl. ¶ 19. White began a twenty-two year stint at ERS in 1993, when he was hired as an Economist. Compl. ¶¶ 21, 25. He thereafter moved up the ranks, receiving a promotion to Vice President in 1998 before ultimately becoming a Managing Director of ERS's Labor and Employment ("L&E") Group in ERS's Washington, D.C. office in 2010. Compl. ¶¶ 21, 25. In that role, White provided economic research, statistical analysis, and expert services related to the field of labor and employment to ERS's clients. Compl. ¶¶ 1, 3. White supervised the nine ERS employees in the L&E Group, interfaced directly with the clients, and was exposed to and had access to ERS's trade secrets and confidential and propriety information. Compl. ¶¶ 3, 27.

As a condition of his employment, White signed periodic contracts with ERS, including the 2015 Managing Directors' Compensation Plan consummated on June 29, 2015 (the "2015 Employment Agreement" or the "Agreement"). Compl. Ex. 3 [Dkt. #1-3]; *see* Compl. ¶¶ 28–32; *see also* Compl. Ex. 1 [Dkt. #1-1]; Compl. Ex. 2 [Dkt. #1-2].[2]  The

---

[2] The 2015 Employment Agreement superseded any previous employment agreements between ERS and White. *See* Compl Ex. 3 § 3(c) ("The parties . . . agree that there are no prior or other agreements or understandings between the parties, including, without limitation, salary, bonus, compensation, shareholder, membership, severance, transaction bonus or any other such agreements, covenants, promises, or understandings between the parties hereto with respect to the terms of employment between ERS and [White], except as expressly set forth herein.").

2015 Employment Agreement contains several restrictive covenants that are applicable to White given his role as a director, only a few of which are relevant here. First, the Agreement bars directors from disclosing ERS's confidential information to third parties at any time following their departure from ERS.[3] Compl. Ex. 3 § 3(i). Second, it prohibits directors from soliciting ERS employees or clients for the twelve months following their separation.[4] Compl. Ex. 3 §§ 3(k)(i)–(ii). Third, and finally, the Agreement precludes Directors, once again for a period of twelve months after leaving ERS, from performing "any act that [the] Director[s] knew, know[], or reasonably should have known might directly injure ERS or its parents and affiliates in any material respect." Compl. Ex. 3 § 3(k)(iv).

On July 6, 2015, shortly after signing the 2015 Employment Agreement, White resigned from his position at ERS and, effective July 17, 2015, left to manage ERS's

---

[3] The Agreement states in relevant part: "Director will, during Director's employment with ERS and at all times following the date of termination of Director's employment with ERS . . . not reveal, discuss, communicate, publish, use, disclose or disseminate in any manner [ERS's] Confidential Information to any third party . . . ." Compl. Ex. 3 § 3(i); *see also* Compl. Ex. 3 § 3(j) ("In order to preserve ERS's rights and interests in Confidential Information, Director agrees that he will not disclose such Confidential Information without express authorization from ERS . . . .").

[4] Specifically, the 2015 Employment Agreement prevents Directors from doing any of the following: "Hir[ing], or attempt[ing] to hire, contact or solicit with respect to hiring or assist in or influence the hiring of, for Director or on behalf of any other person, company or entity, any employee . . . who worked for or was providing services to ERS at any time during Director's employment with ERS provided, that this clause (i) shall not apply to any individual who initiates contact with Director or applies for a position through a general public solicitation for employment." Compl. Ex. 3 § 3(k)(i). The client non-solicitation clause likewise precludes Director from doing any of the following: "Solicit[ing], divert[ing] or tak[ing] away, or attempt[ing] to solicit, divert or take away . . . any customers, clients, referral sources, business, or accounts of ERS, with whom Director worked with, serviced, contacted, called upon, met, or communicated with . . . during Director's employment with ERS. The parties agree that this provision does not preclude[] Director from providing services to customers, clients, or referral sources who contact Director and seek to utilize Director's services." Compl. Ex. 3 § 3(k)(ii).

competitor Resolution's nascent Washington, D.C. office. Compl. ¶¶ 38–39. ERS then spoke with Saad, an owner and managing director of Resolution, about potentially selling the remainder of ERS's Washington, D.C.-based L&E Group and its related infrastructure to Resolution. Compl. ¶¶ 14, 49. Plaintiff alleges that Saad initially expressed interest in an acquisition of the whole group but then stated that since ERS's employees were free to simply leave ERS and work elsewhere it did not make sense to do so. Compl. ¶ 50. Thereafter, on July 17, 2015, White's first day at Resolution, Resolution sent an "email blast" directly to ERS's clients announcing that White had joined Resolution as a Partner and inviting them to contact White at his new phone numbers or email address. Compl. ¶¶ 42, 46; Compl. Ex. 5 [Dkt. #1-5]. ERS claims that White and Resolution's objective in sending the email announcement was to solicit ERS's clients, Compl. ¶ 45, and that White and Resolution then made additional attempts to win over ERS's clients by reaching out to them individually, Compl. ¶¶ 45–47. According to ERS, defendants' efforts were immediately successful, and ERS began to receive formal notices from its clients requesting that their files be transitioned to Resolution. *See* Compl. ¶ 46.

The exodus was not limited to ERS's clients. In the wake of White's resignation, several other members of ERS's Washington, D.C. L&E Group, all of whom had worked for White, quit their jobs at ERS and joined Resolution.[5] *See* Compl. ¶ 52. By August 10,

---

[5] The first wave of resignations commenced on July 28, 2015, when Victoria Dritsos, a Senior Database Analyst at ERS, tendered her resignation. *See* Compl. ¶ 53; Compl. Ex. 8 [Dkt. #1-8]. Rick Holt, a Principal at ERS, followed suit less than an hour later at 11:20 a.m. *See* Compl. ¶ 54; Compl. Ex. 9 [Dkt. #1-9]. At 12:03 p.m. that same day, John Fahr, another Principal at ERS, tendered his resignation, and at 2:29 p.m. and 4:00 p.m., Principal Edward Bierhanzel and Senior Database Analyst Kevin Weissman respectively

2015, nine of the ten employees in the practice group had resigned their posts. Compl. ¶¶ 53–62. ERS places the blame for this defection squarely at White's feet, asserting that "White either actively solicited the Washington, D.C. [Labor and Employment] Group to join Resolution or, at the least, influenced Resolution to hire them in breach of his non-solicitation obligations." Compl. ¶ 63. ERS contends, in short, that defendants "decimated" its Washington, D.C. office. Compl. ¶¶ 64–65.

ERS commenced this suit on August 10, 2015, by filing a Complaint alleging breach of contract, numerous commercial torts, violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*, and violations of the District of Columbia's Uniform Trade Secrets Act, D.C. Code § 36-401, *et seq*.[6]  That same day, ERS moved for a preliminary injunction, which I denied on October 21, 2015. Mem. Op. [Dkt. #33]. In the meantime, defendants filed the present Motion to Dismiss.

---

resigned their posts. *See* Compl. ¶¶ 55–56; Compl. Exs. 10-12[Dkts. #1-10 – #1-12].  Senior Consultant Julie Frizell, who resigned at 4:07 p.m. was the last to resign that day. *See* Compl. ¶ 58; Compl. Ex. 13 [Dkt. #1-13]. The onslaught of resignations continued the following day when, less than twenty-four hours after Ms. Frizell's resignation, ERS Office Manager Mark Sanchez resigned his post. *See* Compl. ¶ 59; Compl. Ex. 14 [Dkt. #1-14]. The following Monday, August 3, 2015, brought two additional departures: Robin Das and Karen Calderon, both of whom were Senior Database Analysts at ERS. Compl. ¶¶ 60–61; Compl. Exs. 15–16 [Dkts. #1-15 – #1-16]. As of August 10, 2015, only one employee remained in ERS's Washington, D.C. L&E Group, but ERS "anticipate[d] receiving his resignation upon his return from vacation." Compl. ¶ 62.

[6] The Court has jurisdiction over the Computer Fraud and Abuse Act claim pursuant to 28 U.S.C. § 1331 and may exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a). Moreover, the Court has diversity jurisdiction as the matter in controversy exceeds $75,000 and is between citizens of different states. *See* 28 U.S.C. § 1332; Compl. ¶ 11 (stating ERS is organized under Florida law and has offices in Florida, California, and Washington, D.C. ); Saad Decl. ¶ 2 [Dkt. #19-2] (explaining Resolution has offices in Los Angeles, Chicago, and "now" Washington, D.C.); Compl. ¶ 13 (stating White is a resident of Virginia).

## LEGAL STANDARD

"[Federal Rule of Civil Procedure] 8(a) sets out a minimum standard for the sufficiency of complaints . . . ." *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977). It requires "a short and plain statement of the claim" and is intended "to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Id.* It also "serves to sharpen the issues to be litigated and to confine discovery and the presentation of evidence at trial within reasonable bounds." *Id.* The rule "is by no means exacting," and it "accords the plaintiff wide latitude in framing his claims for relief." *Id.* at 499.

Under Rule 12(b)(6), meanwhile, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ."). A court must "treat the complaint's factual allegations as true" and "grant plaintiff the benefit of all inferences that can be derived from the facts alleged[.]" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks omitted). However, the court need not "accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns*

6

*Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "In ruling on a 12(b)(6) motion, a court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F. Supp. 2d 82, 85 (D.D.C. 2011).

## DISCUSSION

### I.   Count I: Breach of Contract

In Count I, plaintiff alleges that White breached his contractual obligations under the 2015 Employment Agreement not to solicit ERS clients, not to solicit ERS employees, not to disclose ERS's propriety or confidential data, and not to take action that he knew or reasonably should have known, might directly injure ERS. Compl. ¶¶ 68–71. The 2015 Employment Agreement provided that it "shall be construed according to the laws of the State of Virginia," Compl. Ex. 3 § 3(f), and the parties assume Virginia law will apply to plaintiff's breach of contract claim. When determining which state law to apply, "the Court applies the District of Columbia's choice-of-law rules." *Essroc Cement Corp. v. CTI/D.C., Inc.*, 740 F. Supp. 2d 131, 141 (D.D.C. 2010). Under those rules as applied by District of Columbia courts, "parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified." *Id.* As White is a resident of Virginia, the "'reasonable relationship' threshold"

7

is satisfied, and the Court will apply Virginia law to plaintiff's breach of contract claim.[7]
*Id.*

Under Virginia law, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E. 2d 610, 614 (Va. 2004). Defendants argue plaintiff has failed to state a claim of breach of any of the provisions of the 2015 Employment Agreement. After careful evaluation of the parties' respective arguments, I deny defendants' Motion as it pertains to plaintiff's claims that White breached the non-solicitation of clients, non-solicitation of employees, and do no harm provisions of the Agreement.

I agree with defendants, however, that plaintiff failed to state a claim that White breached his obligation not to disclose ERS's confidential information. The Complaint alleges that White breached the Agreement by sharing ERS's customers' identities and non-public contact information with Resolution. Compl. ¶¶ 43, 70. But the Complaint does not sufficiently specify which aspect of the Agreement's confidentiality provision White violated by doing so. The 2015 Employment Agreement defines "Confidential Information" as

> any and all information that is proprietary and/or confidential, secret or
> otherwise not generally known to those in ERS's industry and pertains

---

[7] The Court will likewise apply Virginia law to plaintiff's implied covenant of good faith and fair dealing claim (Count XII), as this is consistent with the parties' assumption and as this claim arises out of the terms of the 2015 Employment Agreement.

directly or indirectly to ERS and its operations and activities, products, services, employees, contractors, consultants and suppliers, including any and all formulae, methods, techniques, processes, know-how and data, technical or non-technical whether written, graphic, computer-generated or orally furnished to [White] by ERS or any of ERS's authorized Representatives. This Confidential Information does not include matters that are owned by the client or that have been paid for by the client as part of the fees for using the services of ERS . . . Confidential Information does not include information that (i) is or becomes publicly known; or (ii) is known to [White] other than from ERS (and became known legally and without the violation of any rights of ERS) and is without any proprietary or confidentiality restrictions at the time [White] receives such information.

Compl. Ex. 3§ 3(i). As it failed to identify where the names and contact information of ERS's customers fit into this definition, plaintiff failed to state a plausible claim of breach of the non-disclosure obligation. *Cf. Compel v. Citi Mortgage, Inc.*, Civ. No. 04-1377, 2005 WL 4904816, at *2 (E.D. Va. Feb. 23, 2005) (explaining that in order to state a claim of breach of contract, the plaintiff "must identify which provisions imposed the purportedly breached obligation" and that "[t]he absence of such detail prejudices defendant's understanding of the defenses available to it and how it should proceed"). Count I is therefore dismissed without prejudice with respect to plaintiff's claim that White breached a non-disclosure obligation of the Agreement.

## II.    Counts IV, V, VI: Intentional Interference Claims

Counts IV, V, and VI of the Complaint allege intentional interference with contractual and business relations. The elements of intentional/tortious interference with a contractual or business relationship under District of Columbia law[8] are: "(1) existence

---

[8] The parties assume District of Columbia law governs ERS's claims contained in Counts II, III, IV, V, VI,

of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).   In Count IV, plaintiff alleges that each of the defendants intentionally interfered with ERS's contractual relationships with its clients.  Compl. ¶ 87. Plaintiff claims that "[b]y soliciting ERS's customers and employees, Defendants, with malice, have intentionally interfered with ERS's contracts with its customers by preventing ERS from fulfilling its contractual obligations . . . ."  Compl. ¶ 88.  Defendants are correct that plaintiff failed to sufficiently allege interference.[9]  Defs.' Mem. 18, 19; Defs.' Reply 14.  The gist of plaintiff's allegations is that the *en masse* departure of its L&E Group employees rendered ERS unable to provide necessary services to its clients.  *See* Pl.'s Opp'n 23 (citing Compl. ¶¶ 8, 10, 42–45 and Ex. 7).  But the Complaint does not allege any specific facts plausibly suggesting that ERS actually failed to perform any contractual obligation owed to a client.  And to the extent plaintiff argues that Count IV is premised on ERS's customers taking their business to Resolution, Pl.'s Opp'n 22, the Complaint does not allege that by doing so any ERS customer breached or failed to perform a

---

VII, X, XI, and XIII.  "[W]here all parties assume that D.C. law applies, '[t]he Court need not and does not question the parties' assumptions on that point.'"  *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 248 (D.D.C. 2011) (quoting *Davis v. Grant Park Nursing Home LP*, 639 F. Supp. 2d 60, 65 (D.D.C. 2009) (alteration in original)).

[9] Although defendants argue that the Complaint does not allege "that ERS's contracts with its customers were *breached*," the D.C. Court of Appeals has held that "a 'breach' as such is not required" to satisfy the third element of tortious interference with contractual relations and that a "mere[] failure of performance" will do.  *CASCO Marina Dev.*, 834 A.2d at 84.

contractual duty owed to ERS.

In Count V, plaintiff claims that all the defendants intentionally interfered with ERS's relationships with its customers and employees with which ERS had "an expectancy of [] continuing business relationship[s]" and a corresponding "probability of future economic benefit to ERS." Compl. ¶¶ 91–96. Defendants rightfully assert that plaintiff's conclusory allegations are insufficient to state a claim. Defs.' Mem. 18; Defs.' Reply 16. As to ERS's relationships with its clients or customers, the Complaint fails to identify the specific business relationships with which defendants are alleged to have interfered or to substantiate ERS's claim of an expectancy that those relationships would continue, and it therefore fails to plead the existence of valid business relationships with the requisite specificity.[10] *See, e.g., Gov't Relations Inc. v. Howe*, Civ. No. 05-1081, 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007) (properly alleging a tortious interference claim includes specifying the subject of the alleged interference); *Nyambal v. Alliedbarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016) (a plaintiff must name the specific relationships that "defendant allegedly interfered with" in order to state a claim).[11] And as

---

[10] Plaintiff provides an exhibit to its Complaint purporting to show one ERS client requesting to have its account files transferred to Resolution at White's behest. *See* Compl. Ex. 6 [Dkt. #1-6]. The client's identifying information is redacted. To the extent plaintiff desires material information in a filing to be redacted from the public record, it should seek a leave from the Court to file the document under seal. *See* Local Rule 5.1(h).

[11] Defendants also argue plaintiff has not alleged any conduct that could support an intentional interference claim. Defs.' Mem. 19. Although the allegations could certainly be more specific, plaintiff has alleged conduct on the part of White and Resolution that could support a claim of interference. *See* Compl. ¶¶ 8–10, 42–48. However, I do agree that the Complaint makes no specific allegations as to Saad interfering with ERS's relationships with its clients or customers. Indeed, the only concrete allegations regarding Saad's actions are those claiming he poached ERS's *employees*. Compl. ¶¶ 50–51.

to the allegation of intentional interference with ERS's relationships with its employees, plaintiff sheds no light on the nature of their "business relationships." Specific facts about the terms of the relationships and whether the employees were subject to at-will employment agreements are necessary to state a plausible claim, because, "if there is no fixed or assured employment there is nothing tangible with which to interfere." *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997); *see also Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 24 (D.D.C. 2002) (explaining that under District of Columbia law, at-will employees do not have a valid business relationship or expectancy with their employers for the purposes of a tortious interference claim) (citing *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C. 2000)).

Count VI alleges that Saad and Resolution tortiously interfered with the provisions of White's 2015 Employment Agreement that prohibited White from soliciting ERS's clients and employees. Compl. ¶ 98. Defendants are correct, however, that Count VI and the paragraphs that precede it, *see* Compl. ¶ 97, lack sufficient allegations as to Saad's and Resolution's involvement in White's conduct. Indeed, they do not contain any allegations plausibly suggesting Saad or Resolution "induce[ed] or otherwise caus[ed]" White to breach his contractual obligations to ERS. *Paul v. Howard University*, 754 A.2d 297, 309 n.23 (D.C. 2000) (quoting *Restatement (Second) of Torts* § 766 (1979)). Plaintiff points to its allegation that Resolution sent out the email blast. Compl. ¶¶ 8, 42, 43. While it is *possible* that Saad and Resolution urged White to add ERS's clients to the email distribution list with the intent that White violate the non-solicitation or confidentiality

provisions of his employment agreement with ERS, none of the factual assertions in the Complaint move such a claim "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). Plaintiff next cites its allegations that Saad eschewed the idea of acquiring the L&E Group through a transaction and stated "that ERS's employees [could] simply leave and work elsewhere," Compl. ¶ 50; *see also* Compl. ¶¶ 51–52. These allegations perhaps support an inference that Saad then influenced ERS employees to join Resolution. They do not, however, suggest that Saad or Resolution prompted, swayed, influenced, or motivated White to himself lobby ERS employees to defect.[12] For all these reasons, Count IV, Count V, and Count VI fail to state claims and are dismissed without prejudice.

## III.    Count VII: Unfair Competition

Count VII alleges that defendants engaged in unfair competition by "systematically

---

[12] Defendants further argue that Counts IV, V, and VI should be dismissed for failure to allege that the intentional procurement of the alleged interference involved improper or egregious conduct. Under the District of Columbia's formulation of tortious interference, a defendant is liable only if his interference is both "intentional[]" *and* "improper[]" or "wrongful." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008) (quoting *Restatement (Second) of Torts* § 766). However, the D.C. Court of Appeals has made clear that unlike the intentional conduct prong, "[w]rongful conduct is not an element of a prima facie case of tortious interference under District of Columbia law." *Id.* at 901; *see also Armstrong v. Thompson*, 80 A.3d 177, 190 (D.C. 2013). Instead, a potential affirmative defense to a tortious interference claim is that defendants' conduct was "legally justified or privileged." *NCRIC, Inc.*, 957 A.2d at 901; *see also id.* ("Instead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not."). The Federal Rules of Civil Procedure "do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant." *McNamara v. Picken*, 866 F. Supp. 2d 10, 17 (D.D.C. 2012) (quoting *Chem–Met Co. v. Metaland Int'l*, Civ. No. 96-2548, 1997 WL 74541 (D.D.C. Feb. 19, 1997)); *see also Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ("The pleading requirements in the Federal Rules of Civil Procedure, however, do not compel a litigant to anticipate potential affirmative defenses, . . . [or] to affirmatively plead facts in avoidance of such defenses."). As such, plaintiff need not allege wrongful or improper conduct in order to survive a motion to dismiss for failure to state a tortious interference claim under District of Columbia law.

induc[ing] ERS's employees to leave their present employment with the purpose of crippling and destroying a critical part of ERS's labor and employment practice area" and by executing the inducement with "malice and the intent of illicitly seizing and pirating ERS's business identity, its trade secrets and confidential information, technical expertise, employees and clients." Compl. ¶¶ 103–104. In the District of Columbia, "[u]nfair competition is not defined in terms of specific elements, but by various acts that would constitute the tort if they resulted in damages." *Hanley–Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 153 (D.D.C. 2011). Acts that have been recognized as supporting an unfair competition claim include, "defamation, disparagement of a competitor's goods or business methods, intimidation of customers or employees, interference with access to the business, threats of groundless suits, commercial bribery, inducing employees to sabotage, [and] false advertising or deceptive packaging likely to mislead customers into believing goods are those of a competitor." *Id.* (quoting *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982)).

Plaintiff does not argue that it has made allegations of one or more of the recognized acts listed above but instead maintains that defendants' alleged "corporate raid" of ERS constitutes unfair competition and relies on statements by courts in other jurisdictions that "systematically[] inducing employees to leave their present employment is actionable [unfair competition] when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization." Pl.'s Opp'n 28 (quoting *Reading Rainbow, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. Ct. 2003)). To be sure, our Circuit

14

Court made a similar—though not identical—observation about District of Columbia unfair competition law in 1978, stating that "engaging in activities designed solely to destroy a rival" is a form of unfair competition. *Ray v. Proxmire*, 581 F.2d 998, 1002 (D.C. Cir. 1978). However, the Circuit Court provided the caveat that unfair competition is a "limited" tort given our society's encouragement of "aggressive economic competition." *Id.* at 1002. Even assuming *Ray*'s recognition of plaintiff's theory is not dicta and remains good law, plaintiff's own Complaint acknowledges that Saad and Resolution were attempting to expand their business by entering the Washington, D.C. market and that White was selected to lead the launch of Resolution's Washington, D.C. office. Compl. ¶¶ 2, 4, 5, 49. With such acknowledgement of legitimate business motivations, plaintiff has not sufficiently alleged that defendants' *sole* aim was to dismantle ERS's L&E Group, and thus the Complaint fails to state a claim of unfair competition. *See Scanwell Labs., Inc. v. Thomas*, 521 F.2d 941, 949 (D.C. Cir. 1975).

## IV.   Count VIII: Computer Fraud and Abuse Act

Plaintiff alleges in Count VIII that defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by either obtaining—in the case of White—or directing ERS employees to obtain—in the case of all defendants—ERS's confidential information on its computers without access or in excess of authorized access. Compl. ¶¶ 107–09. The CFAA, which is intended "primarily to deter computer hacking," *Lewis–Burke Assocs., LLC v. Widder*, 725 F. Supp. 2d 187, 194 (D.D.C. 2010), contains "a private cause of action for any person 'suffering damage or loss' from a violation of the

act." *Roe v. Bernabei & Wachtel PLLC*, 85 F. Supp. 3d 89, 102 (D.D.C. 2015) (quoting 18 U.S.C. § 1030(g)).  Plaintiff argues that defendants violated 18 U.S.C. § 1030(a)(2)(c), which forbids "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." Compl. ¶¶ 106–111.  The CFAA defines "exceeds authorized access" as "access[ing] a computer with authorization and . . . us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." *Id.* § 1030(e)(6).

Defendants argue that plaintiff has failed to state a claim because plaintiff does not allege any defendant "accessed information without authorization or beyond their authorization." Defs.' Mem. 21.  They point out that the Complaint concedes that White "had access to ERS trade secrets and confidential proprietary information" in the course of his employment with ERS.  Compl. ¶ 27.  Moreover, although the Complaint alleges that each of the defendants directed ERS L&E Group employees to "copy and remove ERS data" for defendants' benefit, it does not allege that in doing so any of those ERS employees retrieved data that they did not have permission or credentials to access.  Compl. ¶ 109. Defendants rely on *Roe*, in which my colleague Judge Tanya Chutkan of our Court held that a person "exceeds authorized access" when he or she "accesses information on the computer that the person is not entitled to access."  85 F. Supp. 3d at 102 (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)).  Under this interpretation of the CFAA, an employee's *misuse* of data that he was authorized to access in the course

of his employment is not actionable.[13] *Id.*; *see also Lewis–Burke Assocs.*, 725 F. Supp. 2d at 194 ("'Exceeds authorized access' should not be confused with exceeds authorized use."). I agree this is the proper interpretation of the statute, "which speaks only of authorized 'access' to data and not of use." *Roe*, 85 F. Supp. 3d at 103. Because the Complaint does not allege that any defendant accessed or caused any other person to access ERS data that the accesser did not have permission to obtain in the scope of his or her employment with ERS, plaintiff fails to state a CFAA claim.

## V.      Count IX: District of Columbia Uniform Trade Secrets Act

In Count IX, plaintiff alleges that defendants misappropriated ERS's trade secrets, "including information related to ERS's customers, as well as proprietary formulas, software code and databases used for performing expert economist services and calculations for its clients" in violation of the District of Columbia Uniform Trade Secrets Act ("DCUTSA"), D.C. Code § 36-401, *et seq.* Compl. ¶ 113. The elements of a DCUTSA claim are: "(1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose." *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007). To qualify as a trade secret, "(1) the information must be secret; (2) its value must derive from its secrecy; and

---

[13] The Ninth Circuit's interpretation of the CFAA, followed by Judge Chutkan and Magistrate Judge Facciola of this District, has also been adopted by the Second and Fourth Circuits. *See Roe*, 85 F. Supp. 3d at 102–103. The Fifth and Seventh Circuits employ a broader interpretation under which accessing a computer in conjunction with "violating the duty of loyalty or acting with interests adverse to the employer voids the authorization an employee may have to access the computer." *Id.* at 102; *see also Lewis-Burke Assocs.*, 725 F. Supp. 2d at 192 (explaining circuit split). Our Circuit Court has yet to weigh in.

(3) its owner must use reasonable efforts to safeguard its secrecy." *Id.* at 78. Although the question of whether a piece of information is a trade secret is typically a question of fact, information is not a trade secret as a matter of law if it is "easily ascertainable by the public or generally known within an industry." *Id.* (internal quotation marks and citation omitted). As defendants argue, the Complaint contains no factual allegations that would support an inference that any of the information defendants allegedly misappropriated was valuable because of its secrecy or that ERS used "reasonable efforts to safeguard its secrecy." Defs.' Reply 20–21. Indeed, defendants assert that ERS routinely discloses its clients' identities and its formulas and methods in the course of its work assisting clients in litigation. Without supporting details, plaintiff's assertion that the allegedly misappropriated information constitutes a trade secret is nothing more than a "legal conclusion[] cast in the form of [a] factual allegation[]." *Kowal*, 16 F.3d at 1276. Count IX is therefore dismissed without prejudice for failure to state a claim.

## VI.    Count X: Breach of Fiduciary Duty

Count X alleges that White violated the fiduciary duty he owed to ERS as its managing director by "taking steps to raid ERS's business for the benefit of a competitor of ERS, including providing the competitor with confidential client information and assisting in the solicitation of ERS's employees and clients."[14]   Compl. ¶ 121.   In the

---

[14] In its opposition, plaintiff also argues that White breached his fiduciary duty by failing to disclose his intent to leave ERS and compete with it as an officer of Resolution. Pl.'s Opp'n 31 (citing Compl. ¶ 6). However, that theory is inconsistent with Count X, which only alleges that the breach of fiduciary duty was White's preparation for "raid[ing]" ERS. *See* Compl. ¶ 121.

District of Columbia, "[c]orporate officers and directors owe an undivided and unselfish loyalty to the corporation such that there shall be no conflict between duty and self-interest." *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (internal quotation marks omitted). However, "upon termination of [his] employment, [a director] may compete against [his] former employer." *Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32, 40 (D.D.C. 2009); *see also Phillips v. Mabus*, 894 F. Supp. 2d 71, 93 (D.D.C. 2012) ("As a general rule, an employee's fiduciary duty ends upon termination of the employment relationship."). Thus, in general, "post-termination activities [] cannot serve as the basis for any claim of breach of an agent's fiduciary duty to his principal." *Draim*, 631 F. Supp. 2d at 40.

Defendants argue that the Complaint fails to state a claim of breach of fiduciary duty because it does not adequately allege White took any specific action while still employed at ERS. Defs.' Mem. 25–26. Instead, defendants state, the only concrete actions set forth in the Complaint which could support Count X were taken *after* White's departure from ERS or at an unidentifiable time. In response, plaintiff cites its allegation that White accessed ERS's confidential information while still employed at ERS as supporting its claim of breach of fiduciary duty. Pl.'s Opp'n 31 (citing Compl. ¶ 107). Curiously, elsewhere in the Complaint, plaintiff claims that White did not *disclose* ERS's confidential information to Resolution until immediately after resigning from ERS. Compl. ¶ 135. As the breach of fiduciary duty claim is premised on White's *provision* of the information to Resolution, the contradictory allegations of the Complaint do not state a plausible claim

that White breached his fiduciary duty in this respect.  And as to Count X's allegation that White assisted in the solicitation of ERS employees while he himself was still at ERS, I note that White's last day at ERS was July 17, 2015, Compl. ¶ 38, and the L&E Group defectors did not begin to resign until July 28, 2015, Compl. ¶¶ 53–61.  The Complaint therefore lacks any non-conclusory allegations to render plaintiff's timeline for the alleged solicitation plausible.  For these reasons, Count X is dismissed without prejudice.

## VII.   Counts XI and XII: Fraud In the Inducement and Breach of the Covenant of Good Faith and Fair Dealing

In Count XI, plaintiff claims White defrauded ERS when he negotiated and entered into the 2015 Employment Agreement by failing to disclose that he intended to leave ERS and take ERS's clients and employees with him.  Compl. ¶ 125.   In the District of Columbia, the elements of a fraud claim are "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013).  "A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen." *Id.* (quoting *Rothenberg v. Aero Mayflower Transit Co., Inc.*, 495 F. Supp. 399 (D.D.C. 1980)).  "[T]he general rule is that one party to a transaction has no duty of disclosure to the other unless (1) the party is a fiduciary of the other, or (2) the party knows that the other is acting unaware of a material fact that is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection." *Sandza v. Barclays Bank*

*PLC*, 151 F. Supp. 3d 94, 107 (D.D.C. 2015) (citing *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51 (D.D.C. 2011)).

Plaintiff argues White had a duty to disclose, given his status as an officer of ERS. Defendants maintain that the very terms of the 2015 Employment Agreement, which the Court notes are cited in the Complaint, make it apparent that ERS was on notice of the potential that White could leave his job and would desire some option to work with ERS employees and clients when and if he did. Defs.' Mem. 28. I agree. The Complaint's acknowledgment that a precise topic of ERS and White's negotiations was the terms for White's interaction with ERS employees and clients in the event of his departure from ERS contradicts plaintiff's claim that it would not have entered into the 2015 Employment Agreement had it known that very eventuality would materialize. Thus, Count XI, as written, does not state a plausible claim that ERS relied on a false impression that White was staying at ERS or that he would not hope to work with ERS clients and employees if he moved on from ERS. It is therefore dismissed without prejudice.

Count XII makes a related claim that White violated an implied covenant of good faith and fair dealing by entering into the 2015 Employment Agreement, then promptly resigning from ERS, and "thereafter immediately disclosing ERS's confidential information and soliciting ERS's employees and clients for the benefit of a competitor." Compl. ¶¶ 133, 135. Generally, "[i]n Virginia, every contract contains an implied covenant of good faith and fair dealing which is breached when a party exercises contractual discretion in bad faith." *Harmon v. Dyncorp Int'l, Inc.*, Civ. No. 13-1597, 2015 WL

518594, at *13 (E.D. Va. Feb. 6, 2015) (internal quotation marks, citations, and alteration omitted). As defendants argue, however, an exception applies to employment contracts. *See, e.g, id.* ("Virginia law 'does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment contracts in particular.'") (quoting *Devnew v. Brown & Brown, Inc.*, 396 F. Supp. 2d 665, 671 (E.D. Va. 2005)); *Wright v. St. Charles Water Auth.*, 59 Va. Cir. 244 (2002) ("Virginia does not recognize an independent claim for breach of an implied covenant of good faith and fair dealing in an at-will employment contract.").

As the at-will employment agreement between White and ERS did not contain an implied covenant of good faith and fair dealing that gives rise to a cause of action, plaintiff did not, and cannot, state a claim by alleging White violated such a duty by resigning from ERS.[15] Plaintiff argues the non-solicitation and non-disclosure provisions of the 2015 Employment Agreement fall outside of the at-will employment doctrine, and, therefore, an implied covenant of good faith and fair dealing should be imposed at least as to those provisions. Pl.'s Opp'n 35. Unfortunately for plaintiff, courts interpreting Virginia law have declined to recognize an implied covenant of good faith and fair dealing not just as to termination of at-will employment but in the entire "employment context." *Devnew*, 396

---

[15] Plaintiff argues that Virginia law only precludes a cause of action where imposing a duty of good faith and fair dealing would "alter the at-will nature of the employment contract and prevent an employer from terminating the employee." Pl.'s Opp'n 34. Defendants rightfully respond that such a "one-way rule" benefitting employers in litigation "is illogical and impractical." Defs.' Reply 24. More importantly here, however, it finds no support in the case law cited by the parties which imposes no such limitation on the exception to the implied covenant of good faith and fair dealing for employment contracts.

F. Supp. 2d at 671 (holding plaintiff failed to state a claim of breach of an implied covenant of good faith and fair dealing where the conduct alleged was related to a provision of the employment agreement that required plaintiff to "remain an insurance agent in good standing in the Commonwealth" and stating that the federal court is "not empowered to broaden the scope of an implied covenant of good faith and fair dealing from the commercial context to the employment context"). Count XII is therefore dismissed with prejudice.

## VIII.   Counts II, III, and XIII: Conspiracy, Aiding and Abetting, and Accounting

Three counts in plaintiff's Complaint identify theories of liability and a remedy as opposed to actionable legal claims. In Count II, plaintiff alleges that defendants engaged in a conspiracy "by agreeing with each other to wrongfully and tortiously seize and pirate the business identity, technical expertise, employees and clients of [ERS's] L&E Group." Compl. ¶ 76. District of Columbia "law does not provide an independent cause of action for conspiracy; instead, it is a means for establishing vicarious liability for an underlying tort." *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 40 (D.D.C. 2015) (internal quotation marks and alterations omitted). "To the extent, therefore, that Plaintiff seeks to hold Defendants liable for 'conspiracy' independent of any other tort," Count II fails to state a claim as a matter of law and is dismissed with prejudice. *Id.* Moreover, insofar as plaintiff is attempting to state derivative claims that defendants are vicariously liable as co-

conspirators for one another's underlying torts,[16] defendants are correct that the allegations set forth in Count II and the paragraphs that precede it, *see* Compl. ¶ 75, fail to specify the precise torts for which plaintiff seeks to hold each defendant liable under plaintiff's civil conspiracy theory. *See* Defs.' Mem. 16; Defs.' Reply 12. Instead, plaintiff generally and vaguely identifies examples of categories of "overt acts in furtherance of the conspiracy." Compl. ¶ 78; *see also* Compl. ¶¶ 1, 4. As such, plaintiff's "allegations do not give the defendants sufficient notice of the actions for which [plaintiff] seeks to hold them vicariously liable under a civil conspiracy theory." *Dooley v. United Techs. Corp.*, Civ. No. 91-2499, 1992 WL 167053, at *14 (D.D.C. June 17, 1992). Therefore to the extent Count II alleges liability based on conspiracy for underlying torts, it is dismissed without prejudice.

Similar analysis applies to Count III, in which plaintiff claims Saad and Resolution aided and abetted White, because "[a]ccording to the District of Columbia Court of Appeals, to which this Court looks on issues of District of Columbia law, the tort of aiding and abetting is not recognized under District Law." *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012) (citing *Flax v. Schertler*, 935 A.2d 1091, 1198 n.15 (D.C. 2007)). Instead, aiding and abetting is at most a means of establishing vicarious liability.[17] *Carroll*

---

[16] To allege such a claim, a plaintiff must first successfully plead the elements of the underlying tort and then must sufficiently plead "the existence of a conspiracy," *id.*, the elements of which are: "'(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'" *Kenley*, 83 F. Supp. 3d at 40 (quoting *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)).

[17] Indeed, it is questionable whether aiding and abetting is even "an actionable theory of liability" in the

*v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 53 (D.D.C. 2009). To state a claim, a plaintiff must adequately plead three elements: "(1) a wrongful act causing an injury by a party aided by the defendant; (2) the defendant's knowledge of his role as part of an overall illegal or tortious activity at the time that he provided assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." *Acosta Orellana*, 711 F. Supp. 2d at 108. The Complaint alleges that Saad and Resolution aided and abetted White in "unlawful and tortious acts . . . including, but not limited to, breaching the non-solicitation and confidentiality agreements and intentionally interfering with ERS's contractual and business relations." [18] Compl. ¶ 81. Plaintiff argues that its allegations in paragraphs 4, 82, 83, and 116 of the Complaint are sufficient to plead "Saad's and Resolution's awareness and encouragement of, and role in inducing, White's misconduct." Pl.'s Opp'n 40. However, these paragraphs contain only "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. They are entirely devoid of the factual allegations necessary to state plausible claims, *see Twombly*, 550 U.S. at 570, and therefore Count III is also dismissed without prejudice.

In Count XIII, entitled "Accounting," plaintiff demands an order "[c]ompelling Defendants to provide Plaintiff with an accounting of all revenues and profits they have

---

District of Columbia. *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 107 (D.D.C. 2010) (stating that "[t]here does not appear to be case law in the District of Columbia that explicitly recognizes" such a theory). This Court will assume for now that aiding and abetting is indeed a recognized theory of civil liability in the District of Columbia.

[18] To the extent the Complaint seeks to hold Saad and Resolution vicariously liable for additional, unspecified tortious conduct on the part of White, it does not give defendants sufficient notice and thus fails.

received from or in connection with any current or former client of ERS." Compl. ¶ 13. But, as defendants assert, an accounting is a *remedy* "that is only appropriate, if at all, after liability has been determined." *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 10 (D.D.C. 2014) (internal citation and quotation marks omitted). As our Circuit Court has made clear, "identifying a remedy is not stating a claim." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015). Although plaintiff is free to argue an accounting would be an appropriate remedy if it is successful on the merits, Count XIII does not state a claim as a matter of law and is therefore dismissed with prejudice.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendants' Motion to Dismiss, with prejudice, as to Counts II and III, to the extent they are standalone claims of conspiracy and aiding and abetting, Count XII, and Count XIII. Further, the Court GRANTS defendants' Motion to Dismiss, without prejudice, as to Count I, with respect to plaintiff's claims that White breached a non-disclosure obligation of the Agreement, Counts II and III, to the extent they allege vicarious liability for other underlying torts, Counts IV, V, VI, VII, VIII, IX, X, and XI. Finally, the Court DENIES defendants' Motion as to Count I, with respect to plaintiff's claims that White breached the non-solicitation of clients, non-solicitation of employees, and do no harm provisions of the 2015 Employment Agreement. Plaintiff will hopefully exercise more careful judgment as this case continues to move

forward in the future.    An Order consistent with this decision accompanies this Memorandum Opinion.

_____

RICHARD J. LEON
United States District Judge